That's case number 4-1-2-0-0-8-3 for the appellant William Neupel and for the appellate Thomas Hartzell. Please proceed. Thank you. May it please the court, counsel. Well, here's a day on a case that involves race judicata. There are two cases involved and I'd like to take just a minute to go through the facts in the 10-year-old case because that's where all this started. First of all, in the 10-year-old case, the Billingsleys built a pond adjacent to the Peters property. The Peters owned 40 acres next to the Billingsleys and there was a gully that came down through the corner of Peters property onto the Billingsleys property. The Billingsleys decided to build a pond so he dammed it up, built a pond, put an outlet pipe in it some 8 feet below the surface of the Peters property and all seemed to be well. Except in 2002, Peters brought suit against Billingsley, claiming that Billingsley backed water up into his gully, not onto his farmland but into the gully, didn't claim any damages, just claimed he had a technical trespass and he was entitled to relief. The first thing that Billingsley did was to hire an engineering firm by the name of Clinger out of Quincy, Illinois, who are well known throughout western Illinois for their drainage work, to see if they could come up with a solution to the problem. Clinger, in fact, did a lake study, and that's part of the record here, coming up with some potential solutions, none of which were acceptable to the parties and they were never able to get it worked out. So a hearing was held in July of 2003 and an order was entered ordering Billingsley to not back water up onto the Peters property. So that was the end of the case for then and things went on for some time and then in about a year and a half a petition for rule to show cause was filed, alleging that Billingsley had in fact backed water up onto the Peters property. There was a hearing held on that and there was a finding of no contempt. So then another period of time went by and there was another petition for rule to show cause filed. There was a hearing held on that and I think Judge Pope at that time had the case from beginning to end. And at that hearing she, there's 14 pages in the record of what she had to say about the case, but the attorneys were to work out an order, a formal order to follow, but there was no finding of contempt. And the order was never entered because the parties, attorneys could never get together in an agreed order. However, it was somewhat softened, I think, from the original order because she had indicated that Billingsley had some time with which to get the water off the property and so on. But for one reason or another, and I was involved in it, the parties could never agree. So then five years went by and after five years then the attorney who originally represented Mr. Peters, Mark Vincent, withdrew and Mr. Hartsell entered his appearance for the Peters. When that happened, Billingsley hired Clinger again to come in and see if they could work out a solution to the problem. And Clinger again went out onto the property and came up with some ideas but in what he concluded in his study was a memorandum dated 5-14-10 that was conveyed to me as counsel for Billingsley on 5-21-10 saying that the back 7.5 acres of the Peters property that had been tiled into the gully actually drained the other direction. So at that point we anticipated a third petition for rule to show cause and I filed a motion for that the court enter a final order based on the hearing on the second petition and also for other relief stating that the court should take into account by mitigation the fact that some of the water that came into that gully was drained there unlawfully. Before that was ruled on there was a third petition for rule to show cause filed and then within about three weeks thereafter that my petition that I filed for entry of a final order and other relief was denied. So then within just a few days afterwards this case 11CH2 was filed alleging that in fact 7.5 acres of the Peters property drained unlawfully into the gully which fed the Billingsley pond and that we were entitled to some relief even if it were so trivial as to be a technical trespass. A hearing was held on that and the suit that I filed in 11CH2 was dismissed based on a motion dismissed filed by Peters and we filed a notice of appeal and here we are. It's Billingsley's position that he couldn't litigate facts that he didn't know. Why didn't he know them? He didn't know them because he relied on a late study given to him by Clinger which contained conclusions and had appendices in it. The appendices had such things in it as a complicated equation, it had velocities, it had engineering figures and included was a topographical map but that was not an issue in the first case. And that is the essence I see of the Peters brief is that the topographical map should have been litigated at the first instance in the 2003 case and if that had been done then we wouldn't be here. However, it's kind of like driving through the Rocky Mountains and seeing the water run uphill beside your car if you've never done that. Sometimes it isn't all what it seems to be. No one suspected the 7.5 acres was in fact drained the wrong way. Aren't the same core of operative facts at issue in both instances? I don't think so because the issue in the first case was whether or not the Peters property was dominant to the Billingsley property and there's no doubt just looking at it, it was. No one had any idea that the 7.5 acres, the last part of it, in fact also was being drained the wrong direction and so I don't think it's a single set of facts. I think they're completely separate. What does that mean, being drained the wrong direction? If you had a break line, this drains into the gully, the last 7.5 acres would have naturally drained to the south. They put a tile through and they put it deep enough that they drained it all into the gully, which actually explains why the case never got resolved. It means then the water didn't drain in accordance with the laws of gravity. Correct. The tile didn't drain in a different way. Which is one of the reasons why the tile came in so low in the gully because they had to put it in really low to catch that last 7.5 acres. Was that first examination of the land, was that a joint effort to try to resolve, who ordered that done? So that's your client? Yes it is. So your client hires an expert to look for remedies and in looking for those remedies he would have to look at the dominant and servient estates and he would have to determine the flow of water. Yes. And the piping on the 7.5 acres predates that examination of the land. That's right. Well, it sounds like the same operative facts. Your client may have been not well served by either the expert or by his perusal of the information and then deciding what to do, but those facts were in existence. They just weren't known, but they could have been known, should have been known if you're going to litigate the question of drainage. Well, they were known to the extent of the issue at the gully itself as to the fact that most of the land you could tell drained right into the gully and would have naturally drained there. We had no idea that the tile went all the way back to the far end until later on. Well, race judicata is not only what was litigated, but what could or should have been litigated or considered. I understand that. And I would not disagree. We didn't know because nobody dreamed that that part of the dominant estate had been rerouted. Except, shouldn't the expert have figured that out? The way that you're talking about this, I'm sure you know more about it than we do, but that sounds... Where does the water come from? Well, it comes from the dominant estate. What part of the dominant estate is causing the water to flow that way? Just the hill, or the natural grade, or is there something else? If I were the expert, I think I'd want to know and be able to advise the person that retained me what needed to be done to solve the problem that apparently both neighbors were having. I think, quite frankly, no one ever worried about it at the time because there was no doubt about the dominant and surrogate estates at the time. Right at the point where the water came out into the gully, there's no doubt about it. But way back, you know, three quarters of a quarter of a mile, things changed, and that really wasn't a big issue at that time. It was only when they talked about raising the tile. Look for it in the second lawsuit, or second time that Peter's... I guess I should say the second time Clinger was hired. Clinger had to decide at that point whether or not the tube could be raised. And that's when he looked and saw that it can't be raised because it drains the other land, and it drains naturally the other direction. So it was just something that my client didn't know. Clinger didn't bring it up until May of 2010, and we couldn't litigate what we didn't know. Well, for purposes of race to your decada, why shouldn't you be charged with finding out, your client finding out, and dealing with all aspects of water and drainage on these two properties so that, what was it, eight years after the fact, you can't come in and say, you know, we just learned something else and we want to sue all over again. It seems to me to be precisely a violation of the policy race to your decada was decided or was propagated to address. Well, if you even look at it from the other standpoint of prescriptive rights that I raised in my brief here, you know, it's really unfair and unjust to now allow Peters to, for all time, drain his tract of land over and into the Billingsley Pond and to have drainage prescriptive rights that no one dreamed he had, and it ends up with a very unfair result is what it does. Well, but, you know, litigation is supposed to be a beginning, a middle, and an end, and during the middle is when each party is supposed to present all of its experts and evidence and this is it. I'm not supposed to have multiple bites at the apple because things that could have been discovered weren't, but we've discovered them since and, by God, this is going to change everything we want to litigate it again. But it really wouldn't have changed anything on the first case as far as the order that was entered in 2003. It still would have said that Dominant and Serviet and that my client had to not run water back on it. Wouldn't it have changed possibly the remedy imposed? I don't know if it would have or not. Well, what you're asking to do now is different from what happened then, isn't it? I'm asking now to be able to litigate the facts that we just found out in 2010. If you were successful, if this case weren't dismissed, if it went to trial and you prevailed, wouldn't the remedy you're now seeking be different from the remedy or the action the judge took with regard to the 2003 case? Yes, it would be different. That means then that we're talking about changing as a result of subsequent litigation the result of that earlier case and it seems to me that we're doing so based upon information. Don't challenge at all just the nuclear position your clients didn't know. But they're chargeable with nuclear. There's no reason they couldn't know. They could have gotten additional or better engineering studies. To a large extent, I guess it's just a question of, gee, we're stuck with what we had at the time and we want to be excused from that. Well, maybe like in other civil litigation, you could find a better expert or a more thorough person or a better witness, but I don't see how any of this constitutes an excuse to relax the bar against the multiple litigation over the same core of operative facts. I don't see it much different from statutes of limitation cases where you discover something later that you didn't know, particularly when you hire an expert and the expert gives you conclusions and you look at the conclusions, try to work out a solution, and he's got all sorts of complicated appendices. I don't think that you hire the expert so you can read all the appendices. The question then is should you have known? Did you know or should you have known? I don't think so. That would be in a statute of limitations context that you suffered an injury and that the injury was wrongfully caused, if you want to have a statute of limitations extended here. What about this was not something they could have known or obtained? It's a fairly limited area of inquiry for that matter, isn't it? Where does water flow between these two properties? Somebody would have thought about it. Well, if you're litigating it, aren't you supposed to have thought about it? I think that's why you hire an expert and you rely on the expert's conclusions. Well, whose fault is it that you hired an expert who wasn't as thorough and complete as maybe he should have been? Is that the fault of the Peters?  On the other hand, I don't think it would have changed the litigation as far as the overall order entered by the court in 2003, still telling Billingsley not to back water up into the Peters' gully. Wouldn't it change that a bit? It would change other aspects of it. It might have changed other aspects of it. I agree. So basically my position is, and I think we've already pretty well covered it, is that we can't litigate what we don't know. That I agree with the fact that it is not a question of facts changing. It's just what we knew about the facts is the issue. I don't see any case law that says one way or the other that that's a legitimate excuse or not a legitimate excuse. But it's a fact. And then you have the cases which we all have cited in our briefs here, saying that the law is fair and logical and that race judicata is only applied as justice and fairness require. I think it's very unfair in this case to not allow Billingsley to have some relief from a potential prescriptive easement of drainage across his land for all time and be subjected to multiple petitions for a will to show cause when in fact the people who brought that lawsuit drained their water in unlawfully. Thank you. Thank you, counsel. You will have rebuttal. Mr. Hartzell. Thank you, Your Honor. May I please report, Attorney Newell? My name is Tom Hartzell, and I do represent the Peters, Ronald, and Linda. And as you know, they are the, or they were, the plaintiffs in the 02 case and the defendants in the 2011 case and the appellees here. Basically, this is a pretty simple case. Farmers, water, and drainage. And there's nothing that can excite farmers more than water and drainage almost. The Peters did find that water was being backed up on their property, brought the initial lawsuit in 2002, was successful after a trial in which, as has been noted, the defendant, Billingsley, had an expert opinion, a late study done, obviously from the record. It was a trial where many exhibits were introduced into evidence, testimony was taken, and then a ruling was made in the Peters' favor in 2003.  Mr. Billingsley did not really like the results of those, including the last one that was filed and ruled in the Peters' favor. And all of a sudden he came up with 7.5 acres and filed this other lawsuit. It is the same lawsuit over the same issues, basically. Same land, same land of Peters, same land of Billingsley. The Peters have done nothing to their land since 2002, haven't increased their tile lines or changed their tile lines in any way. It is the perfect race judicata suit. As you know, there are three requirements for race judicata. Prior judgment on the merits, we actually have two here. We actually have the 03 order by Judge Pope, which basically disposed of the case. And then we have the March 1, 2011 order where the Billingsleys petitioned to enter a final order where they also brought up 7.5 acres was decided against them. How are the Billingsleys supposed to know about tile on your client's property? Well, several reasons. There are several ways they could have. Number one is they could have asked, either in depositions or in other types of discovery possibly. Number two is the tile outlet was part of the original proceeding and part of the, shall we say, issue of where the tile outlet was and how high it was. So obviously, that told them there was tile at least in some of the Peters' property. And they could have done further investigations. They might have asked Peters for a tile map of their property. They might have had a tile person go out and try to locate the tile. Their engineer or their expert could have asked more questions about it and had Billingsleys' attorney inquire further about it since we were talking about water and drainage. So your client said a tile map of their property? You know, I don't think they've ever actually been able to come up with one because I did ask them. But as far as I know, there was never any discovery initiated concerning the tile map. And the Billingsleys could have compelled your clients to tell them where the tile was, where it drained from and to where? Well, I think... Because just seeing an outlet doesn't really tell you, well, where are the different parts of the tile? What part of the ground does it actually drain? Right. And I think there was some discussions at some point about how much tile there was on there and that the Peters did let them know that the whole 40 acres was tiled. Now, where exactly the tile lines were in the 40 acres, they never got that far. There was never that much inquiry, I guess you might say, about it. Now, whether or not the Peters could have come up with a tile map, if they would have maybe gone back to the guy who tiled it, which would have been, of course, several years before 2002 even, you know, I don't really know. I guess what I'm getting at is I think there's a real residue problem here. But maybe there was no way actually for them to know about that 7.5 acres. Maybe there was no way for the late study expert to have known what the tile drain was actually draining with regard to their farm. Right. I can't articulate that very well, but I think you know what I'm talking about. Right. And I think even back in 2002, there was at least some GPS mapping available back then, or for sure, I know that the engineer could have set up points on the 40 acres and taken different readings and discovered exactly what were the low points of the 40 acres, what were the high points of the 40 acres. And then from there, you know, if it would have been told to him that, yeah, there's tile all over the 40 acres, well then, you know, at that point, I would think he would be underneath an obligation to find out how much of it's coming from the 7.5 acres. How much of it's over here on this side of the 40 acres? Is it even through the 40 acres? When was the tile put in? You know, Your Honor, I don't know that I really know, but it was before 2002 several years. Peters had owned this ground for about 15 years before the 2002 case. I think there's something in the record that suggests the tiling of the 7.5 acres was just in the year, year and a half before. And it seems to me that if I was the water expert, I'd say, what, if anything, have you done recently that could have changed the flow of the water from this dominant state? You know, well, we just put in some new tile on 7.5 acres last year. That would be something to inquire further about. Well, and assuming that is correct, it was only like a short time flow, a visual inspection of the premises may have still shown those tile lines how they tend to, you know, right after they get done, they're higher, and then they tend to settle a little bit, and then they usually try to settle a little bit more. So the tile pertaining to the 7.5 acres was essentially new at the time of the original litigation? Well, essentially, yeah. So it wasn't like a pattern tile of the entire 40 acres that happened to drain into one outlet? It was tile added to drain the 7.5 acres and extra tile? No, no. The whole field was tiled at the same time. I'm sure of that, and I'm sure it all goes into this one outlet. That's the only outlet there is. So the whole 40 acres goes into one outlet that dumps into this ditch. Okay. And your position is the expert should have known that, and therefore since the expert either should have or could have known that, it should have been litigated in 02, and this is all res judicata? Right. Our basic position is the fact that which, you know, it's the same parties, the same land, no change in the land between 02 and 10, and, you know, it just classically fits the requirements of res judicata. Yeah, but my notes suggest that it was actually a year before they did the dam. Before the Billingsleys did the dam, Peters installed a tile system along the western boundary of the property draining this way. Now, I don't know if that's all the tile that's on the property, or if that was some additional tile that was added at that point. But at any rate, there was some tile work done the year before the dam. And the dam was done just real recent to when the first lawsuit was filed. Well, I think it said the dam was done in 2000. Yeah, it was done. And there were lawsuits and complaints in 2002, I think. Right. It was done real quickly before then. But, you know, our base position is it's just a classic case of res judicata. In fact, the parties were reversed. That doesn't really matter. I cite some case law in my memorandum in the circuit court about that. Obviously, there's prior judgment, actually a couple prior judgments, that were never appealed from in the 02 case. The 02 case was never appealed from, period. And these clauses, you know, they're just identical. The transactional test fits. Judge Brannon, obviously, he did his own order, laid it out very, very succinctly in that order, and made it very clear about where he's coming from, cited some cases, you know, et cetera. And, you know, as somebody mentioned, I think, already here, that, you know, the res judicata extends to not only what actually was decided in the original action, but also what could have been decided. And that's very clear. So we believe in which the order Judge Brannon entered on January 13th of 2012 should be affirmed. Thank you very much. Thank you. Rebuttal, please. Thank you. Only a couple of things. I note from the questions that were asked here that the question of a tile map wasn't really answered very well. We did, in fact, during negotiations on behalf of Clinger, ask if there was a tile map, and we were told it wasn't available. So it would have been nice if we would have had that. But that was part of what we were trying to do to work out an agreement. So it was done informally. But we did try to do that. I don't think this is the same cause of action. So I think for that reason and the fairness and justice that we are entitled to have the case reversed. And that's still our opinion. Thank you. Counsel, Mr. Hartzell said nothing gets the farmer's attention more than water and drainage, perhaps boundary lines between lands. That might be one other thing. Thanks to both of you. The case is submitted. Court stands in recess.